## IN RE ESTATE OF EDWARD BROGAN.

**GUARDIAN AND WARD: Custody of Ward's Estate—Sale of**
1 **Exempt Property—Order—Sufficiency.** Order of court reviewed, and held to authorize the sale by the guardian of the ward's exempt property.

**EXEMPTIONS: Property Exempt — Sale by Guardian — Proceeds.**
2 The proceeds of exempt personal property belonging to one under guardianship, voluntarily sold by the guardian, under requested order of court, is subject to the claims of the creditors of the ward.

**GUARDIAN AND WARD: Custody of Ward's Estate — Exempt**
3 **Property—Sale—Authority.** The right of a guardian to sell the exempt personal property of the ward is no more circumscribed than the right to sell non-exempt property of the ward.

*Appeal from Sac District Court.*—F. M. POWERS, Judge.

SATURDAY, MAY 13, 1916.

REHEARING DENIED THURSDAY, SEPTEMBER 21, 1916.

ACTION in which guardian claims exemption to property sold by her as guardian. Opinion states the facts. Judgment below—*Affirmed.*

*J. P. Conner,* for guardian and appellant.

*W. A. Helsell* and *Malcolm Currie,* for creditors and appellees.

GAYNOR, J.—In the month of November, 1913, Edward Brogan was adjudged a fit subject for treatment in the inebriate asylum at Knoxville, and was ordered committed to said hospital for treatment, under the statute relating to the detention and treatment of dipsomaniacs and those addicted to the excessive use of narcotics, being Chapter 2-A of Title XII of the Supplement to the Code, 1913. He was confined at Knoxville, for treatment under said order, from the time of his commitment, in November, 1913, until the 1st day of April, 1914. He was paroled on the 5th day of April, 1914.

Prior to and at the time he was committed, he was and had been a farmer, occupying and cultivating a farm consisting of about 320 acres. He was a widower, and had living with him on the farm two sons, aged, respectively, 22 and 14 years, and two daughters, 18 and 13 years of age, respectively. He was engaged in farming during the year 1913, up to the time of his commitment. At the time of his commitment, a daughter, Ellen Brogan, was appointed his temporary guardian. On the 20th day of January, 1914, this appointment was made permanent. In the month of December, 1914, the guardian advertised for sale all the property then upon the farm, and applied to the district court of Sac County for leave to make the sale, as guardian of Edward Brogan. This application was duly filed, and the following order endorsed thereon by the judge of said court:

"On reading the within and foregoing petition to sell personal property, it is ordered that the prayer of the petition be granted, and that the guardian be and she is hereby authorized to sell personal property of the estate, or that part not exempt from execution, on the date and on the terms requested."

In pursuance of this application and order, the guardian sold all the property, except the household goods. The sale included hogs, cattle, horses, farm machinery and farming implements, wagons, buggy and a number of sets of harness, the total sale amounting to $5,174.98. The cattle sold for

$1,875, and the horses, for $1,962.50. The proceeds from the cattle and horses were applied upon certain mortgages and other unsecured indebtednesses held by the German Savings Bank of Odebolt. · After satisfying the bank, paying the balance due on the rent, paying the clerk of the sale, and the auctioneer's fees, there was left in the hands of the guardian a balance of the proceeds of the sale, of $639. On the 19th day of January, 1914, the guardian, Ellen Brogan, filed an application in the court, asking that this balance from the sale of the property be set aside to her ward as exempt, claiming that it was the proceeds of exempt property sold at the sale, in which she recites as follows:

"That the property sold at public auction consisted of farm machinery, horses, cattle and grain; the horses, cattle and grain being covered by chattel mortgages. That the Schmitz Bank of Odebolt, Iowa, held a mortgage covering the horses and cattle, upon which there was a balance of $668.67 due on the day of the sale, and another mortgage upon which there was $772.73 due on the date of the sale, making a total of $1,441.40. That said amount was deducted from the proceeds of said sale, leaving a balance of $3,733.78; that out of this there was applied upon a third note owned by said bank the sum of $2,396.60, which left a balance of $1,336.98, out of which was paid a rent note of $675, after which there was remaining $661.98, and, after deducting additional sale expenses, there is now in the hands of the guardian a balance of $639.97. That the money which the guardian now has in her possession came from the sale of property not covered by mortgage, and particularly all of the money the guardian now has in her possession came from the sale of property exempt from execution and not liable for the debts of her ward. And the guardian, while admitting she has in her possession said sum, to wit, $639.97, asserts that it does not belong to the creditors of her said ward, but is property exempt to her said ward, and that she should hold the same for his benefit. And the guardian asks the court to appoint

a time at which a hearing may be had to determine just what property sold at said public auction was exempt from execution, if the court deems such hearing necessary.''

Upon the filing of this application, all the creditors were duly notified, and appeared and contested the guardian's right to hold said money for her ward, exempt from their claims. After a full hearing before the court, plaintiff's application was dismissed, and the money so held by her adjudged to be subject to the claims of creditors, and not exempt in her hands from execution. From this, she appeals.

Edward Brogan, the ward, was called as a witness for the guardian upon the hearing, and he was asked this question:

''Did you consent to the sale or have anything to do with it? A. Yes. My daughter wrote to me some time before the sale, and I got the letter and sale bill the day before the sale was to come off. I was under guardianship at the time. I think it was the best thing to do then. I have been a farmer all my life.''

The guardian testified:

''I am the daughter of Edward Brogan, and his guardian. I authorized the printing of the sale bills. I talked with my brothers and others, and I thought I should sell the property, and I had the sale immediately in accordance with the sale bill, and the money coming from the sale of the horses and cattle which were mortgaged in the Schmitz Bank, was applied on the mortgages. I paid the rent, $675, and have this balance, $639, now in my possession.''

There is no evidence that Edward Brogan had recovered from the trouble which brought about his confinement in the asylum; there is no evidence that he intended to resume farming. The only evidence touching this is given by himself, when he says:

''When I went to Knoxville, I was living 10 miles northeast of Odebolt. Since my return from Knoxville, I have been living in the town of Odebolt.''

The testimony discloses that Ellen Brogan, as guardian of Edward Brogan, voluntarily, so far as she could voluntarily do so, disposed of the property, not under coercion, but for the purpose of paying off the mortgages on the property, and other debts of Edward Brogan. There is no evidence that this $639 in the hands of the guardian represents the proceeds of any particular property sold at that sale. The guardian sold all the property at the sale, without claiming or asserting any right of exemption to any of it in behalf of her ward. She used the proceeds realized from the sale of the mortgaged property to apply upon the mortgage debt. She dipped, then, into the general fund and took out $2,396.60, and applied that upon an unsecured note held by the bank against Edward Brogan; she dipped again into the fund and took out $750, which she applied on the rent note; she dipped again into the fund after the sale, and took out $80 to compensate the auctioneer for his services in making the sale; she dipped again, and took out $5 to pay the man who acted as clerk at the sale. After this was done, there remained still in her hands, as a balance from the proceeds of the entire property, $639. She claims this as exempt, because she says it represents the proceeds of exempt property.

The sale was made of all the property with the consent and approval of the court in which the guardianship proceedings were pending. The order of the court approving the application for the sale read:

1. GUARDIAN AND WARD: custody of ward's estate: sale of exempt property: order: sufficiency.

"It is ordered that the prayer of the petition be granted, and the guardian be and is hereby authorized to sell personal property of the estate, or that part not exempt from execution, on the date and on the terms requested."

The prayer of the petition was to sell all property, exempt and non-exempt. The court granted the prayer, but gave to the guardian the option to sell, if she so elected, only

so much of the property as was not exempt from execution. She could sell it all, or that part not exempt from execution, on the date and on the terms requested. We think the order was broad enough to authorize the sale of exempt property.

Under this order, she had a right to sell. She represented her ward in the transaction. We may assume that he was incompetent either to consent or to deny her right to sell. She acted for him in the premises. She con-

2. **Exemptions:** property exempt: sale by guardian: proceeds.

sented to the sale of both the exempt and non-exempt property. It is not a question of waiving the right of exemption. If she had the right to sell, and exercised that right, and in the sale passed the title, ownership and a right of possession, voluntarily, the exemption passed from the property, and did not attach to the proceeds. The exemption is of the property. The statute gives a right to *hold* exempt from execution, the property described in the statute. See Section 4008 of the Code, 1897. The statute says:

"If the debtor is a resident of this state and the head of a family, he may *hold* exempt from execution the following property:"

The statute does not say that he has a right to dispose of the property and hold the proceeds exempt from execution, but that he may hold the property. If he parts with the property, he parts with the holding and his right to hold. The exemption ceases when he voluntarily lets go his hold upon the thing exempted. In this case, there is no question that, as a guardian, she had a right, with the consent of the court, to sell the property. It is the sale that released the hold upon the property and the right to the exemption. The exemption attaches to the property described in the statute as exempt, and not to property substituted for the exempted property, or to the proceeds of property when disposed of. Otherwise, one engaged in an occupation in which he had a

right to *hold* certain property exempt from execution, might, while the exemption existed, dispose of it, abandon the business which created the right to exemption, engage in another occupation, re-invest the money in property not exempt to him in the new business, and hold thereby a double exemption, by continuing the original exemption upon the newly acquired, otherwise non-exempt, property, and at the same time hold property which, in the new business or occupation, would be exempt to him under the statute. We realize that there is a conflict in the authorities upon these questions of exemption. This court, however, is committed to the doctrine that the proceeds of exempt property, when it is voluntarily sold, are not exempt in the hands of the owner. See *Harrier v. Fassett*, 56 Iowa 264; *Union County Inv. Co. v. Messix*, 152 Iowa 412. It has also been held that, where the exempt property is taken from the owner without his consent, or against his will, he may take the proceeds and claim exemption, the same as he could upon the property while in his possession. See *Kaiser v. Seaton*, 62 Iowa 463; *Mudge v. Lanning*, 68 Iowa 641. To "hold" means to receive and retain; to retain in one's keeping; to maintain possession of and authority over; not to give or relinquish. See Webster's Dictionary.

The statute gives the right to a debtor, under certain conditions, to hold certain property as against the claims of his creditors asserted upon execution or attachment. When a stranger wrongfully breaks the hold thus given by the statute, he acquires no right to the thing as against the party whose right has thus been invaded, and whose hold has been thus broken. One who voluntarily releases his hold upon the thing exempt while in his holding, voluntarily relinquishes, releases or breaks the link that connects his right with the thing exempt, and, having released his hold on the thing, the exemption, being but an incident to the holding, passes with it.

The right of the guardian to sell exempt property is no

different, no more circumscribed, than the right to sell non-exempt property of the ward.    The right to sell involves the right to part with the possession, and to transfer ownership to another.    It is the act of sale that destroys exemption.    It is the voluntary letting go of the property which is exempt in the holding, and not otherwise, that destroys the exemption.

3. GUARDIAN AND WARD: custody of ward's estate: exempt property: sale: authority.

Much argument has been expended on the thought that a guardian has no right to waive exemptions.    The waiver was not an independent act.    It was a consequence following the voluntary exercise of the right to sell, to dispose of, to part with the property.    It was the act of selling, parting with it voluntarily, that destroyed the exemption, under the holding of this court.    In making this sale, it cannot be contended that the guardian acted outside of her authority as guardian, proceeding as she did with the consent and approval of the court.    Her possession of the property was rightful; the sale was rightful; the loss of the right to exemption was incident to the right to sell.    Assuming the right to sell under the order of the court, we must hold that the right of exemption to the property passed, the same as if the sale had been made by the owner.    The exemption was lost, as a necessary incident to the sale.    So far as the property was concerned, under the holdings of this court, the exemption did not attach to the proceeds of the sale so made.    Assuming that the exemption was a personal privilege, and that it could be waived by the owner of the property (by the ward in this case), the ward is not asserting any claim to exemptions.    His guardian alone is asserting it, and claiming to hold, as guardian, the proceeds of the property voluntarily disposed of by her, as exempt in her hands.

Under the record in this case, we think the judgment of the court was right, and it is, therefore,—*Affirmed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.