NORTHWESTERN STATE BANK OF ORANGE CITY, Appellee, v. HUBERT P. MUILENBURG et al., Appellants.

No. 40091.

March 18, 1930.

*Olin G. Reiniger* and *C. W. Pitts,* for appellants.

*Van Oosterhout & Kolyn,* for Northwestern State Bank, appellee.

*Klay & Klay* and *Hatley & Van de Steeg,* for A. De Ritter and Jans Vrymoet, appellees.

De Graff, J.—The main action herein is an ordinary foreclosure proceeding, and was commenced March 12, 1928. The mortgage involved a quarter section of land situated in Sioux County, Iowa. The defendants Hubert P. Muilenburg and Minnie Muilenburg, husband and wife, were the legal title holders. The other defendants named in the caption were alleged to be subsequent lien holders. Judgment and decree were entered on default in the main action April 13, 1928, and it may be observed at this time that with the original foreclosure suit the plaintiff bank is not concerned on this appeal. The period of

redemption expired May 26, 1929, and prior to the termination of this trial on the new issues presently noted, both the north and the south 80 of the Muilenburg quarter had been conveyed by the plaintiff bank, subject to the right of redemption by Muilenburg.

The issues now joined by the pleadings arise as follows: On April 3, 1928, the defendants De Ritter and Vrymoet filed answer and cross-petition in the original action, and on August 10, 1928, an amendment to the cross-petition was filed, whereby new defendants were introduced in this cause. These new defendants are the three children of defendants H. P. and Minnie Muilenburg,—to wit, Nellie J., Margaret, and Conrad Muilenburg,—who were named by reason of the fact that the grantors of the real estate mortgages foreclosed had executed and delivered to the said three children on March 13, 1928, notes secured by a chattel mortgage ($4,480), covering practically all of the personal property on the Muilenburg farm. The cross-petitions allege that this chattel mortgage was without consideration and fraudulent, and given to hinder and delay the cross-petitioners as existing creditors. Issue was joined by general denial on the part of the cross-defendants.

On January 14, 1929, an agreement was signed by all of the Muilenburgs, wherein it was provided that, for the purpose of liquidating a part of the indebtedness owed by Muilenburg to his said three children, a public sale of all the property covered by the chattel mortgage should be held, but that the proceeds of said sale should be retained in lieu of the property sold, and should be paid by the clerk of said sale to the said mortgagees in proportion to their respective notes, and applied on the indebtedness secured by said chattel mortgage, "in consideration of which, said mortgagees hereby consent to said public sale." The sale was held, and the proceeds of said sale were turned over to the Orange City National Bank of Orange City, Iowa, employed to clerk the sale. On January 15, 1929, the defendants De Ritter and Vrymoet filed a cross-petition against the Muilenburgs, praying for a writ of attachment against the proceeds of the sale. The writ issued, and was served by garnishing the bank and also Peter S. De Jong, debtor of the defendant H. P. Muilenburg. Later, De Jong turned over to the clerk of the court the sum of $243, and the incident was closed as to him.

It was stipulated upon the trial that the ruling of the court in the instant matter "shall affect the sum of $3,899.60, being the proceeds of the sale in the hands of the garnishee, and the sum of $243, being the proceeds from the sale of hogs [to De Jong] making a total of $4,142.60, which sum is divided as follows: From the sale of exempt property mortgaged to children, $1,-368.75; from the proceeds of the sale of exempt property not mortgaged to the children, $130.65; from the proceeds of the sale of nonexempt property, including the $243 hog money, $2,643.20,— making a total of $4,142.60." It was further stipulated, prior to judgment entry herein, that the amount due De Ritter upon the date of the judgment was $1,287.93, and the amount due Vrymoet, $2,387.57, or a total of $3,675.50. The foregoing indebtedness was evidenced by two notes in the sum of $1,900 to Vrymoet, and $1,000 to De Ritter, executed by H. P. and Minnie Muilenburg on June 15, 1919, and April 6, 1921, and secured by a mortgage of $4,000 on the north half of the Muilenburg quarter, and dated April 17, 1922, and duly recorded on said date. At the time of the execution of the chattel mortgage in question, no lien existed on the personal property in favor of De Ritter or Vrymoet. The notes secured by the chattel mortgage to the three children are as follows: Nellie, $1,250; Margaret, $2,880; and Conrad, $350. The trial court found for the cross-petitioners De Ritter and Vrymoet. Personal judgment against the wife, Minnie Muilenburg, was waived. The court ordered that the funds held by the garnishee bank should be paid to the clerk, who should apply said amount ($4,142.60) upon the judgment ($3,675.50), together with costs, statutory attorney fees, and accrued interest, and that the balance remaining, if any, should be paid over to Minnie, Nellie J., Margaret, and Conrad Muilenburg by the clerk of the district court.

In the light of the facts heretofore stated, it is to be determined whether or not the chattel mortgage was executed to defraud the creditors. Was the chattel mortgage without consideration?  To whom shall the funds now in the hands of the garnishee bank be paid? In brief, do the cross-petitioners, as attaching creditors, have priority over the chattel mortgagees in the funds under consideration? These questions necessitate an examination of the record, especially in re-

gard to the basis of the claims of the mortgagees, as evidenced by the notes held by them, respectively. The chattel mortgage covered practically all of the personal property on the Muilenburg quarter. It covered both exempt and nonexempt property. Muilenburg, the title holder, was heavily in debt, and had been for several years. The real estate mortgages on his quarter aggregated approximately $47,800 and accrued interest. Muilenburg was unable to meet the last year's interest payments. Foreclosure suits were pending, and attachments were threatened. The chattel mortgage in question was executed, delivered, and recorded on the day following the filing of the petition in foreclosure by the plaintiff bank. The mortgagor Muilenburg retained possession of all the personal property, and treated it as his own. He sold hogs and corn covered by the chattel mortgage, and gave no credit on the notes. He sold the chattels, not in his home market, but in a distant market. The mortgagor was insolvent, and unable to pay his financial obligations. The beneficiaries of his act knew the father's financial condition. The son Conrad, although he knew nothing about what the father proposed to do, or did do, until the time of the instant hearing, testified that he knew the extent of the property that his father had; that he did want to help his father keep these other creditors out; that he was perfectly willing that his father should take the property covered by the chattel mortgage and do with it as he saw fit; and, "when I got that chattel mortgage, I thought the other creditors couldn't take that property away from me. Q. And that is all you cared, in getting that chattel mortgage, was to cover up the property? A. Yes."

It may further be noticed that no account was kept with these children. There is no record of any kind. The note given to Conrad for an alleged loan of $1,100 to his father is not before us, although it appears from the record that the note was before the trial court, and that certain credits were on the back of said note. The cross-examination of Conrad with respect to these indorsements discloses at least a soft impeachment. When asked if the indorsements had the appearance "of all having been made at the same time," he answered: "I couldn't say,— they might." When asked what he intended to do with the mortgage, he answered: "Oh, I think when my sisters' and my indebtedness is satisfied for, we will release." He also testified

relative to a talk with his father, and said: ''My father felt as though he owed it [debt to Margaret and Nellie] the best for the girls in giving them security.'' But at that time (latter part of 1927), he states, there wasn't anything said between him and his father about giving him security. Conrad's testimony is not clear, satisfactory, or convincing. We do conclude that the chattel mortgage as to Conrad was but a screen, and an attempt to protect the rights of himself and his sisters under the terms of said mortgage.

Muilenburg had been unfortunate in his business affairs, and it must be conceded that the children were truly loyal to him during his financial distress. It was but natural that the father would reciprocate in every way possible, and regardless of creditors, who would take all from him that the law would permit. It was recognized that the father would not be able to forestall · foreclosure proceedings. The father knew that his farm would have to be sacrificed under the foreclosure, and would necessarily indulge the thought, in view of his large indebtedness, that his nonexempt personal property would go the same route. Not until shortly before the execution of the chattel mortgage did the father discuss with his two daughters the matter of their compensation for their services and money given to him. Everything, as testified by the father, in the management of the farm went into the ''family pot.'' When the chattel mortgage was executed, the father had no money, and after its execution, he had no clear property worthy of mention. He withdrew his money from the Orange City Bank, and paid thereafter in cash or by money order. Only his daughters, Nellie and Margaret, testified that they expected to be compensated, one for her services rendered the household, and the other for the earnings which she turned over to the father. The father did not testify that he expected, at the time he received the benefits, to compensate his daughters therefor. Margaret began teaching school in 1923, and was then 18 years of age. She lived at home during all of the time in question. Her salary checks were turned over to her father and cashed by him. Her board and room cost her nothing, and whatever expenses she had in wearing apparel and incidentals were paid by the father. The record does not disclose how much the father paid on Margaret's behalf during these years. It is a mere guess. We are not dealing with *quan-*

*tum meruit,* but with an express written contract,—a promissory note. The amount of that note is simply what the father and daughter thought it should be, and its face is $2,880. Under all the circumstances, we do not view Margaret as a  creditor of the father's. He did recognize his moral obligation, but that is not sufficient to constitute a consideration for a subsequent promise. *Allen v. Bryson,* 67 Iowa 591. There must have existed, prior to the execution of the chattel mortgage and notes, the expectation by the claimants of receiving, and by the parent of making, compensation therefor. *Enger & Co. v. Lofland,* 100 Iowa 303. The note to the daughter Nellie is based wholly on the services performed in the Muilenburg household. She was 25 years of age when her note, in the sum of $1,250, was delivered to her. Her life to June 1, 1928, was spent on her father's farm. She attended school until she was 15 years old. It is clearly shown that she was an industrious girl, not only taking care of a large part of the household duties, but sometimes doing chores on the farm,—milking, feeding the horses and pigs, and occasionally picking corn. There was no record kept, and there was no thought of compensation until she and her father talked over the matter, and "figured up together about what he owed me." This was done shortly before the execution of the note. She testified: "At that time he and I agreed that $1,250 would be the fair amount of indebtedness."

We cannot escape the conclusion that the execution of the notes in question was an afterthought, and resulted from the dire situation which confronted Muilenburg. Emphasis is placed in argument on the fact that the cross-defendants were the children of the grantor of the chattel mortgage. Blood relationship *per se* is not a badge of fraud, but it may strengthen the inference that arises from the circumstances of the case, and will cause a court of equity to scrutinize more closely the facts attending the transaction. *Barks v. Kleyne,* 198 Iowa 793. The intent of the mortgagor and the concurrence therein of the mortgagee must be reached by just deduction from all the proven facts and circumstances. *Steinfort v. Langhout,* 170 Iowa 422. All the circumstances must be considered together, and the force and weight to be given them must be derived from a study of all facts, viewed in combination. *First Nat. Bank v. Hartsock,* 202

Iowa 603. In our judgment, the transactions between these parties can be explained on but one theory, and that is not the theory of the appellants.

It will be remembered that it was stipulated that one item of the fund ($4,142.60) in the hands of the garnishee bank resulted from the sale of exempt property mortgaged to the children,  in the sum of $1,368.75. It will also be remembered that, in consideration of the agreement between the Muilenburgs for the sale of the personal property under mortgage, the proceeds of the sale should stand in lieu of the property sold, and were to be paid to the mortgagees (the three children) in proportion to their respective claims, and applied on the indebtedness secured by the mortgage. Clearly, the exempt property on the Muilenburg farm was not subject to the claims of the cross-petitioners herein. Where the evidence in a case shows that a garnishee holds property of the debtor in a certain value, under a chattel mortgage, even though fraudulent, because made for the purpose of putting the property beyond the reach of creditors, but that a portion of the property so held was exempt in the hands of the debtor, a judgment cannot be rendered against the garnishee for the value of such exempt property. *Brainard v. Simmons,* 67 Iowa 646. See, also, *Korner v. McKirgan,* 202 Iowa 515. The case of *In re Estate of Brogan,* 177 Iowa 423, may be differentiated on the facts and applicable legal principles.

We conclude, therefore, that that part of the impounded fund in the hands of the garnishee to the amount of $1,368.75 was exempt, and, therefore, not subject to the payment of the judgment entered in favor of the instant appellees.

The costs on this appeal shall be taxed, two thirds to the appellants, and one third to appellees.—*Modified and affirmed.*

MORLING, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.