[File No. 6866]

CONGRESS 'CANDY COMPANY, Respondent, v. GEORGE FARMER, Appellant, B. A. Sell, Garnishee and Appellant.

(12 NW(2d) 796, 150 ALR 1316)

175

Opinion filed January 28, 1944

*Albert Lundberg,* for appellants.

176

*DePuy & DePuy,* for respondent.

CHRISTIANSON, J.   This is an appeal from a judgment in favor of

the plaintiff in a garnishment action. The facts out of which the litigation grew and the facts relating to the proceedings had in the action are substantially as follows:

In 1934 the garnishee, Sell, owned a business establishment known as the Community Bar, then in operation in the city of Grafton in this state. In December, 1934, he entered into an arrangement with the defendant, Farmer, whereby Farmer leased the building in which the business was conducted and purchased a one-third ($\frac{1}{3}$) interest in the business. The parties entered into a written agreement whereby Farmer rented the building from Sell and agreed to pay $60.00 per month for rent. They also entered into another written agreement wherein it was stipulated that Sell is the owner of two-thirds ($\frac{2}{3}$) interest in the Community Bar and that George Farmer is the owner of the remaining one-third ($\frac{1}{3}$) interest, after the balance of $500.00 due to Sell has been paid. Such agreement further provided that Sell shall receive two-thirds ($\frac{2}{3}$) and Farmer shall receive one-third ($\frac{1}{3}$) of "all money taken out" and that Farmer shall be the sole manager of the Community Bar.

On May 7, 1936, Farmer purchased Sell's two-thirds ($\frac{2}{3}$) interest in the stock of merchandise in the Community Bar and Restaurant for the sum of $538.00, payable in stipulated monthly payments. Farmer paid both the sums stipulated in the agreement of December 3, 1934, and the $538.00 stipulated in the agreement of May 7, 1936. On May 7, 1936, Sell and Farmer entered into another agreement in writing, denominated "lease and purchase agreement." By the terms of this agreement, Sell agreed to lease unto Farmer his two-thirds ($\frac{2}{3}$) interest in and to all fixtures, cooking utensils, dishes, bar equipment, and all other personal property used in the business of the Community Bar and Restaurant. Farmer agreed to pay for the use of such property the sum of $50.00 per month commencing April 1, 1937, until the sum of $1500.00 had been paid, with interest at three per cent (3%) on all past due payments. And it was stipulated in such agreement that upon payment of said sums the title to the property should pass to Farmer and he should become the absolute owner thereof, but that until said time the title to said property should remain in the said Sell; and that in case of default in such payments or if said Sell should

deem himself insecure, he should have the right to take immediate possession of the property and in such case all sums theretofore paid by Farmer should be applied as paid for rent and use of the property; or the said Sell might, at his option, consider the agreement as a sale and take judgment for the full amount due, and to become due, together with costs. Under this agreement, Farmer paid unto Sell not less than $200.00 nor more than $300.00, . . . the exact amount is not definitely shown. This agreement was filed in the office of the Register of Deeds of Walsh County on February 2, 1938.

Farmer continued to operate the Community Bar and Restaurant until February 3, 1938. During this same time he, also, operated a hotel in the same building, known as the Basell Hotel. The evidence discloses that Farmer had financial troubles and had some difficulty in obtaining the necessary goods with which to operate his business, and on February 3, 1938, Sell stepped in and took over the business. The evidence is not very clear as to what took place between Farmer and Sell before Sell took over, nor is it clear as to the arrangement that was made between them at the time. It does appear, however, that an inventory was made of the merchandise on hand at the time. This inventory was made by Weslie Wilson (plaintiff's salesman, residing in Grafton), and one Chase (salesman for another of Farmer's creditors).

Wilson was called as a witness for the plaintiff. He testified that the inventory was taken on the 3rd of February in the afternoon of that day and was finished shortly before three o'clock. He testified that Sell called him about 12.30 p.m. of that day and asked if he could come down and help take inventory. That he came down and that he and one, Chase, (a representative of another creditor) took the inventory. That they handed the inventory to the garnishee, Sell, and that Sell told Farmer to continue to operate and sell goods up to three o'clock p.m. of that day, and then to take the money out of the till; that he (Farmer) was through then. Wilson testified that no objection was made to the inventory and that about three o'clock in the afternoon, Farmer took the money out of the till and turned it and the business over to Sell and that Sell had continued to run the business from that time. He testified, also, that Farmer had been unable to pay his bills, and that for some time he had sold goods to Farmer only under

an arrangement whereby at the time Farmer purchased an order he gave his check for the amount of the goods purchased, and that such check was sent in and applied upon Farmer's old account.

One Rhode, the manager of the plaintiff company, testified that he was on his vacation on February 3, 1938, when Sell took over the business; that he came back to the state about February 25, 1938, and that thereafter he had a talk with Farmer. That Farmer told him he had not finished his deal; that Sell had stepped in and taken possession, that he (Farmer) had an equity in the property and that the Congress Candy Company would get its share out of the property the same as two other creditors whom he (Farmer) named. That he does not recall whether Farmer stated the amount of equity he had in the property. That Farmer told him no deal had been made, that he was just put out. That he had an equity in there and that Sell had lent him some money. That Farmer did not go into detail. That Farmer said there should be payment of between thirty and forty per cent to the creditors. Rhode further testified that he could identify some of the items shown in the inventory as being goods sold to Farmer by the plaintiff company. That these items were checked in the inventory with an "x."

Wilson, whose testimony was presented in the form of a deposition, did not testify as to whether any portion or what portion of the goods shown in the inventory had been purchased from the plaintiff company; but it was stipulated between counsel that if Wilson and Chase were called as witnesses, they would testify that the items so marked had been purchased from the plaintiff.

At the time Sell took over the business there was some discussion between Sell and Farmer regarding debts which Farmer owed to local creditors, and Sell agreed to furnish the money to pay these bills and gave to Farmer certain checks, some of them payable directly to the creditors aggregating in excess of $700.00. The defendant, Farmer, testified that he also owed Sell some three hundred dollars for rent.

Farmer testified: "I borrowed money from Sell to pay what debts I had in town." "I collected about a thousand dollars around seven hundred dollars, I owed him three hundred some for rent."

He testified further that Sell said the light bill had to be paid but

that he did not suggest that he "pay the local businesses and cheat the other fellows."

Farmer further testified: "I wanted to clean up what debts I had in town here, yes."

"Q. But you didn't want to pay the other fellows, is that it?

"A. Afterwards, yes, if I could."

Farmer further testified that it was his understanding with Sell that Sell should hold the property as security for the money Sell advanced to Farmer with which to pay bills.

On March 7, 1938, the plaintiff, joining with two other creditors, brought action against the defendant, Sell, alleging that the defendant, Farmer, had transferred in bulk the whole of a stock of merchandise and fixtures in violation of §§ 7224–7227, Comp. Laws 1913, commonly known as the Bulk Sales Law. Sell, as defendant in that action, interposed an answer wherein he denied each and every allegation of the complaint, except as admitted, qualified or explained; and alleged that he was the owner of an undivided two-thirds ($\frac{2}{3}$) interest of the fixtures and equipment used by Farmer in the business referred to in the complaint and that such fact was known to the plaintiffs; that the property referred to in the complaint as owned by Farmer was exempt from levy and execution under the laws of the state and that the same was not subject to, or within the provisions of, the Bulk Sales Law, and that any transfer or dealing by Farmer concerning such property affected exempt property only.

It was further alleged that any property, wholly or partly owned by. Farmer, that may have passed from his possession to the possession of the defendant, did so as a pledge to secure the payment of the debts of said Farmer to the defendant in the amount of $1,019.05. That said Farmer had failed to pay said sum and that the defendant held the property and claimed a lien thereon under the terms of his pledge. That he was willing and ready to return and restore the property to said Farmer upon being paid the amount for which the same had been pledged.

The action came on for trial on October 26, 1938. The trial court made and filed its "Decision, Findings of Fact and Conclusions of Law." Such "Decision, Findings of Fact and Conclusions of Law," and the Judgment entered pursuant thereto, were offered in evidence

in the instant case by the attorney for the plaintiff, and were received without objection. In the Decision, Findings of Fact and Conclusions of Law, it is said: "On or about the 3d day of February, 1938, an inventory was made . . . and the inventory so taken showed that Farmer had on hand at said time, at a valuation based on wholesale prices a stock of liquor used in the Bar and goods and merchandise used in Restaurant, of a total value of $716.11. $273.00 of said sum being for liquors on hand in the Saloon or Bar and $443.11 for stock, goods and merchandise in the Restaurant."

"The defendant suggested to Farmer that he should settle with and pay all of his local creditors and as Farmer had no money to pay said local creditors with, the defendant Sell offered to furnish him the money for said purpose and did furnish him five checks, aggregating $717.19, for the purpose of paying his local creditors and said checks were so used by Farmer to pay his local creditors."

"That no contract, sale or transfer in bulk or otherwise, was ever made between the defendant Sell and Farmer and that the said George Farmer is still the owner of and has the legal title to the stock of goods and merchandise shown on the inventory and also his interest in the fixtures. The Court finds from the evidence that no sale in bulk or at all was made as claimed."

In the Decision and Findings of Fact the court refers to a written agreement between Sell and Farmer, and his wife, which it is said was offered in evidence on cross-examination. The agreement is dated April 5, 1938, and purports to be a memorandum of the transaction had on February 3, 1938, including the taking over by Sell of the business on that date, and the advancement by him of money to Farmer with which to pay certain local bills and for his personal use.

It is stated in such memorandum that the stock of goods and fixtures "were left in the hands of the said B. A. Sell as a pledge or security for any advances that had been made or would be made pending a final sale thereof to the said B. A. Sell or, in case no such sale could be agreed upon, then until the sale thereof to some third party, in which case the advances made by the said B. A. Sell would be repaid to him."

It is further stated in such agreement that Farmer and his wife are of the opinion that they are entitled to claim such property as exempt

and that the pledge and the advances were made with this knowledge in mind.

The court ordered judgment in favor of the defendant for a dismissal of the action, and judgment was entered accordingly on December 16, 1938. The garnishee remained in possession of the property which he had received on February 3, 1938. After the termination of the suit, some further negotiations were had and on August 11, 1939, the defendant, Farmer, addressed a written offer to the garnishee, Sell, wherein he stated:

"In accordance with our discussion this morning, instead of foreclosing the pledge you hold on stock and fixtures owned by me, I will sell same to you if a sale can be properly arranged under the Bulk Sales Act. The list of stock and fixtures are in evidence in the case of Bridgeman-Russell Co., et al. vs. B. A. Sell, in the District Court of Walsh County, N. D., and the sale is to cover the stock and fixtures then involved. If and when a sale can be arranged as aforesaid, you are to pay me the sum of Two Hundred ($200.00) Dollars in addition to the sums already advanced by you and for which you hold said property in pledge, which on April 5th, 1938 was the sum of $1019.05.

"I will also furnish you with a sworn statement of my creditors and any other information required for a sale under the Bulk Sales laws."

On August 15, 1939, the garnishee, Sell, sent a notice to the plaintiff and other creditors of the defendant, Farmer, pursuant to the Bulk Sales Law (Comp. Laws 1913, §§ 7224–7227), which provides that any sale within its provisions "shall be void as against the creditor of the seller . . . unless the seller . . . shall, at least five days before the sale, make a full detailed inventory, showing the quality, and so far as possible, with the exercise of reasonable diligence, the cost price to the seller . . . of each article to be included in the sale . . . ; and unless the purchaser . . . demand and receive from the seller . . . a written list of names and addresses of the creditors of the seller . . . with the amount of indebtedness due or owing to each . . . ; and unless the purchaser . . . shall, at least five days before taking possession of such merchandise, or merchandise and fixtures, or paying therefor, notify personally or by registered mail every creditor whose name and address are stated in said list, or of

which he has knowledge, of the proposed sale and price, terms and conditions thereof."

In such notice it was said that the garnishee, Sell, "proposes to buy from the said George Farmer the stock and fixtures, and interest in stock and fixtures, owned by George Farmer in the Basell Hotel and Bar."

It is further stated that said Sell holds the said property under a pledge from the said Farmer to secure the sum of $1019.05, as of April 1, 1938. That instead of foreclosing said pledge he proposes to buy said stock and fixtures and any interest therein owned by said Farmer for the sum of $200.00.

Shortly after receipt of such notice, the plaintiff brought suit against Farmer for a balance of $1016.28, remaining due on February 1, 1938, for goods, wares and merchandise sold and delivered to the defendant, Farmer, by the plaintiff from on or about May 1, 1936, to on or about February 1, 1938. At the same time, the plaintiff brought this garnishment action ancillary to the main action. The garnishee interposed an answer alleging that he had in his possession certain stocks of merchandise and fixtures which had been pledged to him by the defendant, Farmer, to secure the payment of $1019.05, as of April 1, 1938.

That Farmer's interest in the fixtures was: ownership of a one-third interest, and payments aggregating approximately $200.00 on a purchase price of $1500.00 on the remaining two-thirds interest in the fixtures. That the total value of all of said property is considerably less than the amount for which the garnishee claims and has a lien on the property under the pledge.

It is further averred that all of said property is exempt from seizure or sale upon execution and that the garnishee claims such exemption on the defendant's behalf as provided by law and pursuant to his request.

It is further alleged that Farmer is, and at the time of the commencement of the action was, a resident and citizen of the State of North Dakota and the head of a family. That the property of Farmer in the possession of the garnishee, together with all other personal property owned by Farmer, is of a value of less than $1500.00.

The plaintiff served notice of election to take issue on the answer of the garnishee. The defendant, Farmer, made no defense in the main

action and judgment was rendered against him by default on October 6, 1939, for the amount demanded in the complaint. The defendant, Farmer, did not interpose any answer in the garnishment action, but in July, 1940, he made an application to discharge and dismiss the garnishment on the ground that the property in the possession of the garnishee was exempt. In such application it was stated that the defendant is the head of a family, as defined by the laws of this state, consisting of himself, his wife and child, residing with and dependent upon him for support. That he owns no real estate. That "all his personal property of every kind, nature and description is of a value of less than Fifteen Hundred ($1500.00) Dollars, consisting of the following properties, to-wit:—

## Schedule

| | |
|---|---|
| Clothing and other personal belongings | $100.00 |
| Bedroom furniture | 30.00 |
| Living room furniture | 100.00 |
| Kitchen furniture and equipment | 100.00 |
| Equity in pledged property in the hands of B. A. Sell (estimated value over and above indebtedness for which said property is pledged) | 200.00 |
| Total | $530.00 |

The garnishment action came on for consideration at a pre-trial conference at the November, 1940, term of the court and it was agreed that the first issue to be disposed of was the application of the defendant, Farmer, for a discharge and dismissal of the garnishment. When the matter came on to be heard the court denied the motion. Thereafter, on February 15, 1941, the defendant's wife, Helen Farmer, served a claim for exemptions, and notice of motion for discharge and dismissal of the garnishment. In her application she listed the same property as that which had been listed by the defendant, Farmer, in his former application. The hearing of the application of Helen Farmer was joined with the trial of the garnishment action. The issues presented by the affidavit for garnishment, the answer of the garnishee, and the plaintiff's notice of election to take issue thereon, together with

the claim for exemptions of Helen Farmer came on for trial on February 24, 1941. A number of witnesses, including the garnishee and the defendant, testified at the trial. The testimony of the several witnesses tended to establish the facts hereinbefore stated.

Some testimony was received as to the condition of the stock of goods that was taken over by the garnishee, Sell, on February 3, 1938. There was testimony tending to show that some of the stock had been damaged in a flood and, hence, was depreciated in value and in some instances wholly worthless. There was also offered and admitted in evidence a letter written by the garnishee, Sell, to the plaintiff company in reply to a letter which the plaintiff company had written to the garnishee dated March 10, 1938. In such letter reference is made to the action that had then recently been brought by the plaintiff and other creditors against Sell under the Bulk Sales Law. There is a notation on the letter in lead pencil, apparently in the nature of a postscript, wherein it is said: "You haven't a chance. I haven't bought anything from George Farmer. I have it all stored in my building, holding it for back rent."

The trial court in its memorandum decision and in its findings held that there was no pledge of the property to the defendant, Sell. In the findings it is said: "There is no evidence of any pledge except the self-serving conclusion contained in the writing of April 5, 1938."

The court further found "that the conduct of Sell and Farmer was in fraud of plaintiff's rights as creditor and calculated to hinder and delay plaintiff in the collection of its debts and as to plaintiff is null and void."

The court sustained the claim for exemptions filed by the defendant's wife, Helen Farmer.

The evidence as to the value of the properties in the possession of the garnishee is not at all satisfactory; and, as the trial court said in its memorandum decision, such evidence "is not definite." The trial court arrived at the conclusion that at the time of the garnishment, the interest of the defendant, Farmer, in the fixtures in the possession of the garnishee was $375.00; that Sell had sold goods for which he had received payments aggregating some three hundred and sixty-one dollars, and that he had in his possession the remainder of the goods which he had received, which, after allowing for depreciation, were of

the value of $236.74, and that consequently the garnishee, Sell, was liable for property in his possession at the time of garnishment as follows:

Value of Farmer's interest in fixtures .......... $375.00
Proceeds from merchandise sold by Sell interim
    February 3, 1938, and the garnishment ...... 361.00
Goods and merchandise in his possession at the time
    of garnishment ............................ 236.74
                              Total .............. $972.74

The court deduced from this that Sell was liable to Mrs. Farmer in the sum of $200.00, the exemption claimed by her in the property held by Sell, and that Sell was accountable to the plaintiff for $772.74, and personal judgment was ordered and rendered against Sell for that amount.

Logically, the first question that presents itself for consideration is as to whether the property which Sell received or took into his possession on February 3, 1938, was received in pledge. Our statutes provide:

"Pledge is a deposit of personal property by way of security for the performance of another act." Comp. Laws 1913, § 6770.

"Every contract by which the possession of personal property is transferred as security only is to be deemed a pledge." Comp. Laws 1913, § 6771.

The evidence is not very definite as to the understanding or agreement between the parties at the time the goods and fixtures were turned over by Farmer to Sell on February 3, 1938. It is unquestioned, however, that such properties were turned over to and received by Sell; and that, thereafter, Sell advanced and paid over to Farmer, for his use, a considerable sum of money and that the larger portion thereof was utilized by Farmer to pay his local creditors. In the Findings of Fact in the action brought under the Bulk Sales Act, the court found that at the time the inventory was made (February 3, 1938), "Farmer had a purchaser in contemplation from Larimore but the parties failed to come to terms and no deal was made," and that then "negotiations started between Sell and Farmer with reference to the contemplated

purchase from Farmer of the stock of goods and merchandise and also Farmer's interest in the fixtures." The court further found that Farmer and Sell did not reach an agreement and that no sale was made.

As noted above, reference was made by the trial court in its findings in this case to the written memorandum of April 5, 1938, and it is said that this is the only evidence of pledge in this case. The record does not sustain this finding.

Farmer was called as a witness for the plaintiff. On his direct examination he testified as to the delivery of the property to Sell and the advancement or payment to him by Sell of certain sums of money. He said: "I borrowed money from Sell to pay what debts I had in town." He further stated that he received from Sell about seven hundred dollars and that he owed Sell some three hundred dollars for rent.

Sell was called as a witness on his own behalf. On his direct examination he testified that "there was some dickering" between him and Farmer with respect to the purchase by Sell of the stock and fixtures from Farmer, but that they failed to come to any agreement. He testified:

"Q. What agreement did you and George Farmer have about this, about your holding the goods?

"A. I advanced George the money and I would hold the fixtures and stock or if he had anything coming he would get it.

"Q. If you bought it, it was part of the purchase price?

"A. Yes.

"Q. If you sold it to anybody else you got your money back?

"A. Yes.

"Q. In the meantime you were to hold it?

"A. Yes, sir."

The undisputed testimony is that the property was delivered into the possession of Sell and that Sell continued to have possession thereof. The testimony of both Farmer and Sell, quoted above, tends to show that Sell was to hold the property as security for the moneys which he had advanced.

In the action brought under the Bulk Sales Act, the court held that the property had not been sold by Farmer to Sell, and on the trial of this case both Farmer and Sell testified that the ownership of the prop-

erty remained in Farmer and that Sell was to hold the property as security for the moneys due him from Farmer.

The evidence shows beyond doubt that when Farmer turned the property over to Sell on February 3, 1938, all property then owned by Farmer of every kind, including that which he turned over to Sell, was of a value of considerably less than $1500.00. According to the testimony of Farmer, he was the head of a family consisting of himself, his wife and a minor child, residing with him in this state and dependent upon him for support; and he had no property at that time, outside of that which he turned over to Sell, with the exception of some clothing, personal belongings, fixtures, and kitchen equipment, the total value of such latter property being less than $400.00. Farmer's testimony in this respect is undisputed. In fact, there is no contention that on February 3, 1938, before the delivery of the property to Sell, Farmer owned property which, inclusive of that delivered to Sell, was in excess of $1500.00 in value. Hence, at the time the property was delivered to Sell, Farmer might have claimed all of the property which he so delivered as exempt under the provisions of §§ 7730, 7731, Comp. Laws 1913, as amended by chapters 238 and 239, Sess. Laws 1935, and in case he had neglected or refused so to do, the exemption might have been claimed by his wife.

Exemption of property from execution or attachment is a privilege conferred upon the debtor and does not deprive him of any of the ordinary incidents of ownership of the exempted property among which is the power to encumber, to sell, or otherwise dispose of it. So far as exempt property is concerned, there are no creditors within the meaning of the statute relating to fraudulent conveyances. Bump, Fraudulent Conveyances, 4th ed p. 257, § 220; 24 Am Jur Fraudulent Conveyances, p. 259.

The rule established by the authorities, and recognized by our statute, is that a debtor commits a fraud on a creditor only by disposing of such property as the creditor has a legal right to look to for satisfaction of his claim. 37 CJS p. 875; 24 Am Jur Fraudulent Conveyances, p. 259; Comp. Laws 1913, § 7222; Murie v. Hartzell, 58 ND 200–205, 225 NW 311, 312, 14 Am Bankr Rep NS 36.

A debtor violates no legal rights of a creditor by disposing of exempt property. Dalrymple v. Security Improv. Co. 11 ND 65, 88 NW

1033; McKillip v. Farmers' State Bank, 29 ND 541, 151 NW 287, Ann Cas 1917C 993; Strampher v. Hupe, 60 ND 692, 236 NW 247; 24 Am Jur 259, Fraudulent Conveyances; 12 Cal Jur 961; First Nat. Bank v. North, 2 SD 480, 51 NW 96; Noyes v. Belding, 5 SD 603, 59 NW 1069; 37 CJS p. 875; Chicago Coffin Co. v. Harris, 70 Wis 282, 35 NW 733; Northwestern State Bank v. Muilenburg, 209 Iowa 1223, 229 NW 813; McCormick v. Kistler, 175 Mich 422, 141 NW 593, 45 LRA(NS) 497; Joyce v. Armourdale State Bank, 130 Kan 147, 285 P 525.

While distinction has been drawn in some of the authorities between the transfer of property that is absolutely exempt and property which the debtor may claim as exempt (Murie v. Hartzell, 58 ND 200, 205, 225 NW 310, 312, 14 Am Bankr Rep NS 36), there seems to be no valid reason for any such distinction. It seems clear that no injury is caused to a creditor because a debtor disposes of property which he can claim as exempt in event the creditor seeks to enforce payment of the claim by levy of attachment or execution against such property. Certain it is that no greater injury will be caused to a creditor if the debtor disposes of the property before the creditor seeks to subject the property to the creditor's claim, than if the debtor retains the property, and exercises his legal right and claims the property as exempt after the creditor has instituted legal proceedings to subject the property to the payment of the claim. Some of the decisions recognize this to be so, and apply the rule that exempt property is not subject to fraudulent alienation as well to property that a debtor may claim to be exempt as to property that is absolutely exempt. First Nat. Bank v. North, 2 SD 480, 51 NW 96; Noyes v. Belding, 5 SD 603, 59 NW 1069; Northwestern State Bank v. Muilenburg, 209 Iowa 1223, 229 NW 813; Chicago Coffin Co. v. Harris, 70 Wis 282, 35 NW 733. We believe this to be the correct rule, namely, that no fraud is committed by a debtor in disposing of property that is either absolutely exempt or which the debtor has a right to claim as exempt.

It is contended that the fact that Farmer retained an interest in the property that was delivered to Sell operated to render the transfer fraudulent and void within the rule announced in Newell v. Wagness, 1 ND 62, 44 NW 1014. The facts in that case readily distinguish it from this case. That case did not involve the transfer of property that

the vendor might claim as exempt. On the contrary, it involved a transfer of "all property real or personal" owned by the vendor on the date the transfer was made "which was not exempt from execution" with the exception of a quarter section of land that was encumbered in excess of its value. 1 ND at page 66, 44 NW at page 1015. In that case non-exempt property consisting of a stock of merchandise and fixtures of a value of $2700.00 and of book accounts and bills receivable of a cash value of some $6700.00 were transferred by a bill of sale absolute on its face, accompanied by a secret oral agreement reserving to the vendor an interest in the property for everything in excess of some $2900.00—the amount owing by the vendor to the vendee. The property involved in Newell v. Wagness was all within the statute relating to fraudulent conveyances. No part of it was or could be claimed to be exempt. The property involved in the case at bar could all be claimed as exempted by Farmer or his wife under the provisions of §§ 7730 and 7731, Comp. Laws 1913, as amended.

In Newell v. Wagness there was a written instrument absolute on its face. In this case there was no instrument evidencing the terms of the transfer. In Newell v. Wagness no representatives of creditors, other than a representative of the creditor who obtained the transfer, were present or had any knowledge of the transfer at the time it was made. In this case there seems to have been no attempt to conceal the fact that the property was being transferred to Sell. Wilson, the representative of the plaintiff, who, according to his testimony, had represented the plaintiff in making sales to Farmer was called in and he and a representative of one of the other creditors of Farmer took the inventory. Wilson, plaintiff's representative, was present when the transfer was made. As has been noted, Wilson testified in this case with respect to Sell taking over the business, and as to what took place between Farmer and Sell at the time. Wilson at no time testified as to any representations by Farmer or Sell. Wilson at no time testified that any promise was made either by Farmer or by Sell that plaintiff's claim would be paid in whole or in part.

Rhode, the manager of the plaintiff company, testified that after he returned from his vacation about February 25th, he had a talk with Farmer and that at that time Farmer told him that he had not finished his deal; that Sell had stepped in and taken possession; that Sell had

lent him some money and that he owed Sell for rent; that he, Farmer, had an equity in the property; that the plaintiff would get its share out of the property the same as other creditors whom he named; that Farmer said there should be some payment to the creditors—between thirty and forty per cent. There is no testimony by Rhode that he ever saw Sell with respect to the plaintiff's claim or that Sell ever promised to make any payment.

When property is pledged under an oral agreement, there naturally is created a situation, where, to those not familiar with the terms of the agreement, it will appear that the legal title to the property has been transferred to the pledgee; for it is essential to the validity of a pledge of personal property that such property be delivered to the pledgee or to a pledge holder and that possession of, and control over, the property be retained by the pledgee or pledge holder; (49 C.J. 910, Comp. Laws 1913, § 6772) ; but "the interest of the pledgor in the property pledged is entirely separate and distinct from that of the pledgee; . . . the general property or title in the thing pledged remains in the pledgor, subject to a lien in favor of the pledgee for the amount of the debt or obligation for which the pledge is given; and this rule applies notwithstanding an apparent transfer of legal title to the pledgee." 49 C.J. pp. 922, 923.

In light of the undisputed facts, there is no probability that the transfer by Farmer to Sell was merely "colorable" and made for the purpose of enabling Farmer to claim a double exemption (Kopf v. Engelke, 240 Wis 10, 2 NW(2d) 846; Share v. Trickle, 183 Wis 1, 7, 197 NW 329, 331, 34 LRA 1016; Kettleschlager v. Ferrick, 12 SD 455, 81 NW 889, 76 Am St Rep 623).

Farmer was in financial difficulties and no longer in position to carry on, at least not unless he received financial assistance from somebody. For some time the plaintiff had refused him credit and had made sales to him only under an arrangement whereby it was paid for the goods ordered. Aside from the merchandise and the interest in the fixtures, Farmer owned no property except a rather limited amount of personal belongings, clothing and household goods. After some conversation between Sell and Farmer, Sell took over the properties. Before doing so he requested the local representative of the plaintiff

and the representative of one of the other creditors to make an inventory. After inventory had been taken, Farmer stepped out and Sell took over. Sell advanced to Farmer a considerable sum of money to be used principally to pay his local creditors. There is nothing to indicate that this was an act of generosity on the part of Sell and that he intended to make a gift to Farmer of the money so advanced. Sell did not pay over the money until the property had been delivered to him. Farmer had a right to prefer his local creditors. He had a right to sell, mortgage or pledge the property and to utilize the proceeds he received to pay such creditors and his right to do so was not restricted by the Bulk Sales Act. For "the Bulk Sales Law does not apply to sales of property which is exempt by law from execution." McCormick v. Kistler, 175 Mich 422, 141 NW 593, 45 LRA(NS) 497.

The plaintiff contends, however, that the merchandise which Farmer had purchased from the plaintiff was not exempt. That the action is, in effect, one for the purchase price of the property sold by the plaintiff to Farmer and consequently that such merchandise is not exempt but is subject to plaintiff's claim under the provisions of § 7740, Comp. Laws 1913, which reads: "No property shall be exempt from execution or attachment in an action brought for its purchase price or any part thereof."

This contention is, we think, without merit. As has been said, there was testimony to the effect that some of the merchandise listed in the inventory had been purchased from the plaintiff. Certain check marks were made in the inventory. Rhode, the manager of the plaintiff company, testified that he made these marks. The evidence does not show when he made them. He was out of the state when the inventory was made and did not return to the state until some three weeks later. Wilson, the representative of the plaintiff, who assisted in the taking of the inventory, did not testify at all as to whether any items or what items of the goods shown in the inventory had been purchased from the plaintiff company. But it was stipulated that if Wilson and the other person who took the inventory were called as witnesses they would testify that the items checked had been purchased from the plaintiff. Rhode, the manager of the plaintiff company, testified that he could identify some of the items shown on the inventory as being goods sold

to Farmer by the plaintiff company. Rhode stated that "the lines checked" were handled exclusively by the plaintiff in that particular territory. That "the way the liquor set-up is" if the liquor had been purchased from distributors at other points in North Dakota than from the plaintiff (at Grand Forks) it would have cost some two dollars more per case, and there would have been larger transportation costs. That he could not say positively that some of the liquor might not have been purchased from such other distributors, but that it could not have been done for any length of time without the plaintiff's knowing about it; that the distributors do not encroach on each other's territory.

The inventory showed liquor stocks on hand on February 3, 1938, of a value of $273.00. This included all the liquor both that claimed to have been purchased from the plaintiff and that purchased from others. There was no showing as to when the plaintiff had sold to Farmer any of the different items listed in the inventory which it is claimed that Farmer had purchased from the plaintiff. It does not appear that all purchases by Farmer from the plaintiff had been made on a credit basis. For aught that appears at least some of the items checked by Rhode as having been purchased by Farmer from the plaintiff may have been paid for.

The inventory was taken February 3, 1938, the stock was turned over to Sell on that day, and he has remained in possession ever since. The garnishment action was instituted August 18, 1939—more than nineteen months after the garnishee had taken over the stock. There is no evidence to show which, if any, of the items checked by Rhode in the inventory remained in existence and in the possession of the garnishee at the time the garnishment action was instituted.

Section 7740, supra, does not operate to create a seller's lien upon property for the amount of the purchase price. 55 C.J. 898. The statute merely allows the seller of property to subject it to attachment or execution "in an action brought for its purchase price or any part thereof." It "does not give a lien so as to bind the property in the hands of one to whom the purchaser may sell it or affect priorities between creditors." 35 C.J.S. pp. 118, 119.

A party who claims the benefit of the exception from exemption prescribed by § 7740, supra, must bring himself clearly within the terms

of such exception. Paddock v. Balgord, 2 SD 100, 48 NW 840; Wagner v. Olson, 3 ND 69, 54 NW 286.

It is undisputed that the goods claimed to have been purchased from the plaintiff, and checked by Rhode on the inventory, were only part of a stock containing other goods of like character purchased from others. In other words, the goods claimed to have been purchased from the plaintiff had been mingled with other goods and merchandise of like character obtained from other sources. In such circumstances, in order to obtain the benefit of the exception prescribed by § 7740, it was necessary to point out the property which plaintiff claims was purchased from it and for which the purchase price remained unpaid and separate the same from property acquired by Farmer from other sources. 2 Freeman, Execution, 3d ed, § 217, p. 1160. For "if a merchant, in purchasing goods intended for sale, mixes them with others of like nature, so that it can no longer be ascertained from whom any particular parcel was purchased, this does not render the whole stock liable to execution in favor of an unpaid vendor, or any part thereof. On the contrary, the defendant is entitled to his exemption as against each and every vendor, because neither can prove that the goods seized by him were by him sold to the defendant." 2 Freeman, Execution, 3d ed pp. 1160, 1161; Wagner v. Olson, 3 ND 69, 54 NW 286.

The garnishee, Sell, in his answer, interposed, among others, the defense that the property held by him was exempt. He was entitled to interpose such defense. "The general rule is that the garnishee may plead as a defense to the garnishment the exemptions of the defendant from the process." 5 Am Jur 67, Attachment and Garnishment, § 778. This rule is recognized by our statutes. Comp. Laws 1913, §§ 7568, 7575 and 7583.

Section 7568, supra, provides that the affidavit for garnishment must contain a statement "that the indebtedness or property mentioned in such affidavit is, to the best of the knowledge and belief of the person making such affidavit, not by law exempt from seizure or sale upon execution."

Section 7575 (subd. 4), supra, provides that the garnishee in his answer "may state any claim of exemption from execution on the part of the defendant, or other objection known to him against the right of

the plaintiff to apply upon his demands the indebtedness or property disclosed."

Section 7583, supra, provides that "from the time of the service of the summons upon the garnishee he shall stand liable to the plaintiff to the amount of the property, money, credits and effects in his possession or under his control belonging to the defendant, or in which he shall be interested, to the extent of his right or interest therein, and of all debts due or to become due to the defendant, *except such as may be by law exempt from execution.*"

The evidence in this case shows that the legal title and ownership of the merchandise and fixtures that was delivered by Farmer to Sell on February 3, 1938, remained in the defendant, Farmer, subject only to whatever interest or lien the garnishee, Sell, may have acquired therein. The evidence adduced fails to show that such property was "not by law exempt from seizure or sale upon execution" as averred in the affidavit for garnishment. On the contrary, the evidence shows beyond all doubt that the property was so exempt unless the property fell within the exception prescribed by § 7740; and the evidence does not show that the property was or is within such exception.

The judgment appealed from is, therefore, reversed and the garnishment action is ordered dismissed.

MORRIS, Ch. J., BURR, NUESSLE and BURKE, JJ., concur.